1 Duv. 26; *Canada* v. *Com.,* 9 Dana, 304; *State* v. *Hughes,* 4 Iowa, 554. I would state the proper practice under section 20, chapter 158, to be that where a summons to answer an indictment for a misdemeanor under chapters 32 and 151, or any statutory misdemeanor, has been returned served, there may be a judgment for a fine by default; but, if it is proposed to impose imprisonment, there can be no judgment for it by default, but a further process (a *capias*) to bring in the defendant, must issue, and the case would be treated as not under section 20. But a *capias* to bring him in must go, and if returned "Not found," under section 22, a plea of not guilty could be entered, and a trial had by jury, and a verdict of guilty rendered, not by taking the indictment as confessed, but by the state's proving her case. For this purpose the defendant's presence in person or by counsel is not necessary. But if a verdict of guilty be rendered, before a judgment of imprisonment, the defendant must be brought in by *capias ad audiendum,* and the verdict should stand until his presence is procured. There can not be a judgment for a fine at one time, and of imprisonment at another.

We reverse the judgment, and remand the case for further proceedings.

---

# WHEELING.

## STATE *v.* CROSS.

Submitted June 15, 1896—Decided June 24, 1896.

1. CRIMINAL LAW—INSTRUCTIONS—ERROR.
     It is error for the trial court to give instructions prejudicial to the accused, on the trial of a felony case, which are not warranted by the evidence.

2. CRIMINAL LAW—INTOXICATION—ACCIDENT.
     While voluntary intoxication is no excuse for crime, yet under the laws of this state, it can not convert a mere accident into a felony.

3. CRIMINAL LAW—CRIMINAL INTENT.

   It is the duty of the state to allege and prove criminal intent, and if from the whole evidence the jury have a reasonable doubt as to whether such intent existed they should acquit the prisoner.

4. CRIMINAL LAW—CRIMINAL INTENT—BURDEN OF PROOF—ACCIDENTAL KILLING.

   The defense of accidental killing is a denial of criminal intent, and throws upon the state the burden of proving such intent beyond a reasonable doubt, and the accused is not required to sustain such defense by a preponderance of testimony.

SHERMAN ROBINSON and J. NEWMAN for plaintiff in error, cited Code 1891, p. 895; Code 1891, p. 896; 20 W. Va. p. 680; Black. Com. Vol. 2. B. 4, 148; 9 Am. & Eng. Enc. of Law, 541; 33 W. Va. 417; 28 W. Va. 297; 20 W. Va. 738-740; Stephen's Digest of the Law of Ev., pp. 113, 114; Code W. Va. 1891; p. 946; 31 W. Va. 505; 39 W. Va. 415, 658; 37 W. Va. 38, 380, 812; 41 W. Va. 229.

T. S. RILEY, ATTORNEY-GENERAL, for state.

DENT, JUDGE:

At the October term, 1895, of the Circuit Court of Ritchie county, Frank Cross was found guilty of murder in the first degree, and sentenced to the penitentiary for life. From this judgment he obtained a writ of error.

The facts shown in evidence are as follows, to wit: On the 5th day of September, 1895, the accused went to the house of his sister, Ella Taylor, near Cornwallis, in Ritchie county, where his wife had preceded him. He was partly intoxicated, from drinking alcohol, and had on his person a self-cocking revolver he had obtained that day from one George Garrison for the ostensible purpose of preventing a disturbance at his house, where he proposed having a dance that night. When he entered the home of his sister, he spoke to her, and began playing with one of her children, named Edna. His wife began plaguing him about carrying a revolver. He pulled it out, pointed it at her, and told her that if she did not shut up he would shoot her. His sister told him to put it up, or he might hurt some of

the children. This he started to do, and while putting the revolver in his pocket, it was, in some manner, discharged; the ball striking the sister Mrs. Taylor, in the left breast, and immediately killing her. The accused cried out, "I have killed my poor sister!" picked up her body, and placed it on some clothes lying on the floor in another room of the house. He then ran out, and caught a young girl by the name of Delancy, who was leaving the house, and told her not to tell; that he was drunk, and did not go to kill her. He then went up to Delancy's himself, and after some communication with a woman of the family, returned, hid the revolver under the corner of the house, and started for his mother's house, in Cairo. At a short distance he met the husband of deceased coming towards the house, and with the exclamation of "Oh, Cam!" passed him, going out of the road to avoid him, and proceeded on his way. Arriving at his mother's, he hardly got seated until his brother came in and informed his mother what he had done. The officers came immediately and arrested him. Although the state endeavored to show it, there was apparently no ill feeling existing between the accused and the deceased, but their relations were entirely friendly, except that, on occasion, his sister would remonstrate with him about his conduct, and he would inform her that he would manage his house to suit himself. There was no evidence of premeditated or intentional killing. The only two witnesses who saw the accused just before the discharge (being his wife and niece, a child of deceased) say he was in the act of putting the revolver in his pocket when it was discharged. In this state of the testimony the court at the instance of the prosecution, gave the following seven instructions, to wit:

"Instructions for State. No. 1. The jury are instructed that, if they believe from the evidence that the defendant was intoxicated at the time of the killing of Mrs. Taylor, he might yet be capable of deliberation and premeditation; and if the jury believe from all the evidence in the case that the defendant willfully, maliciously, deliberately, and premeditately killed Mrs. Taylor, they should find him guilty of murder in the first degree, although he was in-

toxicated at the time of the killing." This instruction is without evidence to sustain it, as there is no evidence to show, or tending to show, that the "defendant willfully, maliciously, deliberately, and premeditately killed Mrs. Taylor."

"No. 2. The jury are instructed that the defendant, Frank Cross, could not voluntarily make himself so drunk as to become, on that account, irresponsible for his conduct during such drunkenness, and that he might have been perfectly unconscious of what he did, and yet been responsible; and further, he might have been at the time of the killing of Mrs. Taylor incapable of express malice, for the law implies malice in such a case from the nature of the weapon used, the absence of provocation, and other circumstances under which the killing was done." This instruction is also bad, for the law does not imply malice from the nature of the weapon used, unless it first appears that the killing was willfully or intentionally done. Malice is never implied in cases of mere accident, although occasioned by a deadly weapon.

"No. 3. The jury is instructed that drunkenness is no excuse for the commission of a crime." This instruction wrongfully assumes that a crime was committed, and that drunkenness is given as an excuse or justification. While, as an abstract principle of law, the instruction is correct, yet it has no application to the present case. The drunkenness is not set up as an excuse for a crime, but as a potent or contributing cause of an accident. Unskillfulness is no excuse for the commission of a crime, and yet it may be the cause of accidental homicide. And the same may be said of drunkenness. And the fact that a person may be drunk when he accidentally causes the death of another does not convert such accident into a crime. Under our law, drunkenness is not a felony, but is a mere misdemeanor.

"No. 5. The jury are instructed that if they believe the defendant Frank Cross had formed a willful, deliberate, and premeditated design to kill Mrs. Taylor, and, in pursuance of such design, voluntarily made himself drunk for the purpose of nerving his animal courage for the accom-

plishment of such design, and then met Mrs. Taylor when he was so drunk as not then to be able to deliberate on and premeditate the killing, and killed Mrs. Taylor, it is murder in the first degree, and the jury should so find." This instruction is not only wholly without evidence to justify it, but is given right in the face of the evidence to the contrary.

"No. 6. The jury is instructed that a man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act; and if the prisoner, Frank Cross, with a deadly weapon in his possession, without any, or upon very slight, provocation, killed Ella Taylor, he (the prisoner) is *prima facie* guilty of willful, deliberate, and premeditated killing, and the necessity rests upon him of showing extenuating circumstances; and if the jury believe from the evidence that he has not proven such extenuating circumstances or that such extenuating circumstances do not appear from the case made by the state, they should find him guilty of murder in the first degree." This instruction is only proper in a case where the killing appears to have been willfully and intentionally done.

"No. 7. The jury are instructed that if they believe from all the evidence in the case that the defendant, Frank Cross, was guilty of the use of a deadly weapon in the killing of Mrs. Ella Taylor, the intent and the malice may both be inferred from such act; and such malice need not have been directed against her alone, but was such as showed a heart regardless of social duty, and fatally bent on mischief." This instruction was improper, in this case, for the same reason that all the others were improper, and for the further reason that there is no evidence to show that the prisoner had a "heart regardless of social duty, and fatally bent on mischief." The only evidence even slightly tending in this direction was that the accused sometimes indulged in the use of intoxicating drinks, and this, in the present state of the law and the rules of social duty, would not sustain such instruction.

The court also gave the two following instructions on its own motion:

"Instruction A. You are further instructed that if a person kills another without provocation, and through

reckless wickedness of heart, but at the time of so doing his condition, from intoxication, is such as to render him incapable of doing a willful, deliberate, and premeditated act, he is guilty of murder in the second degree. *State* v. *Robinson*, 20 W. Va. 713." There is no evidence justifying this instruction, as the positive evidence does not even tend to show; but rebuts, the allegation of premeditated killing. Nor is the accused shown to have acted through "reckless wickedness of heart." It is true that through intoxication or awkwardness, he may have handled the revolver recklessly, and thus been guilty of a great wrong, in accidently killing his sister, yet this can not convert such accident into a willful and premeditated felony. The court can not disregard the evidence, and give abstract instructions as to the law; for in so doing, as in this case, it may mislead the jury into finding a wholly unjustifiable verdict.

"Instruction B. The jury is further instructed that upon a trial for murder, the use of a deadly weapon being proved, and the prisoner relies upon the defense of accidental killing as an excuse, the burden of showing such excuse is on the prisoner, and to avail him, must prove such defense by a preponderance of the evidence. He may show it by his own evidence, the evidence adduced by the prosecution, the circumstances arising out of the case, or by all of these modes. See *State* v. *Jones*, 20 W. Va. 764." This is a plain misconception of the law by the court. Accidental killing is not such matter of defense as throws on the accused the burden of proving it by a preponderance of evidence. It is the duty of the state to allege and prove that the killing, though done with a deadly weapon, was intentional or willful. In the absence of all proof, when the killing is shown to have been willful or intentional the presumption of malice at once arises; but when the evidence, taken as a whole, raises a reasonable doubt in the minds of the jury as to whether the killing was accidental or intentional, they must acquit the accused, for the reason that the state has failed to sustain its case. In other words, "if, on the whole evidence, the jury are left in reasonable doubt as to the intent of the defendant, they can not convict of the crime." Whart. Cr. Ev. § 764, and note 1.

The circuit court erroneously put the question of accidental killing in the same category with willful killing, where some matter such as self defense or provocation is asserted by way of mitigation, excuse, or justification. In such cases the burden is on the accused to establish his defense by a preponderance of evidence. But the claim that the killing was accidental goes to the very gist of the charge, and denies all criminal intent, and throws on the prosecution the burden of proving such intent beyond a reasonable doubt. Hence the law as propounded in the cases referred to, of *State* v. *Robinson*, 20 W. Va. 713, and *State* v. *Jones* Id. 764, is not applicable.

The court having thus misapprehended, misconstrued, and misapplied the law, and thus misled the jury into finding a verdict unsupported by the evidence, the judgment is reversed, the verdict of the jury set aside, and a new trial is awarded.

BRANNON, JUDGE:

I concur in the reversal of the judgment for the reason that I think that instruction B is bad. To constitute murder, the killing must be a willful, intentional act, or act resulting from such recklessness as implies malice. Accidental killing is not murder. The state must prove such an act as makes the homicide murder. She must show the act to be intentional, as an indispensable element of murder. Where, upon the whole evidence, the question arises, is this homicide intentional or accidental? the jury must believe that it was, beyond a reasonable doubt, intentional. The state must show it to be such. It is therefore error to tell the jury that the defendant must carry the burden of showing it to be accidental. He need not. It must so appear from the state's case. The state charges him with willful murder, and she must show it. But it may be said that this would violate the well settled rule that where a homicide is once shown it is presumed to be murder in the second degree, and, if the accused desires to lessen the degree or excuse himself, he must, by a preponderance of evidence, show to the satisfaction of the jury such circumstances as will do so. On first thought, it might seem so;

but a second thought will, I think, tell us that this presumption does not go so far. That rule assumes that an intentional killing has been shown as an element, and it does not begin to operate until an intentional killing has been shown. How can you say a killing is malicious until you know it was intentional? When such intentional act is shown, the law presumes, as a fact, that as it was an act of the intent, it was an act of malice. It presumes it to be malicious, but does not presume it to be intentional. Malice is the thing which this rule *prima facie* establishes, not intention.

But I do not concur in the above opinion by JUDGE DENT, so far as it condemns all the other instructions given by the court at the state's instance, and instruction A, as bad. Some of those instructions are condemned as abstract. They are not, in my opinion. If there is any evidence however slight—so it be appreciable—to sustain an instruction, it ought to be given, it being for the jury to say whether the state of facts put in the instruction does or does not exist. *Carrico* v. *Railway Co.* 39 W. Va. 86, 101 (19 S. E. 571). Now, it is unquestioned that the evidence shows that the prisoner, a few hours before the death of his sister, procured the pistol whose fatal bullet, while the pistol was in his hands, sent her to the grave, and made her children orphans; that he and his wife went on the road towards that sister's home, and as they came near to it she said to him that both should go in, and he told her to go in, and he would soon come; that he went on to the railroad station, and there procured alcohol; that later he went to his sister's, finding there his wife and sister and her children and a hired girl; that he took up and fondled a little girl of his sister; that he then took out of his pocket this pistol, "fooling with it," or brandishing it; that his wife remonstrated, and he pointed it at her, saying, "You speak two words, and I'll shoot you;" that his sister told him to be careful, as he might shoot her children; that the recklessness of the prisoner with this pistol was such that the hired girl, as also a larger child of his sister, fled; that in a minute or two the pistol was somehow discharged into the breast of the sister, killing her right

away; that he was then in a great state of perturbation; going in and out of the house, seeming greatly excited; that he hid the pistol under the corner of the house, went towards his mother's, meeting his sister's husband, and exclaiming to him "Oh, Cam!" and going into the bushes by the wayside to avoid him; that when he reached his mother's he did not tell her of this awful event, but told his brother; that he remained there until his arrest, very shortly later; that he told a story as to his getting the pistol different from the fact; that some evidence showed that just before the shot he appeared not noticably intoxicated, while other evidence showed him quite intoxicated; that his sister, on several occasions prior to the occurrence, and especially a few days before, upbraided and blamed him with keeping bad women at his house, and that he resented this animadversion upon his conduct, saying he would conduct his house as he chose; and that on this account some ill feeling existed between the prisoner, on the one side, and his sister and her husband, on the other. The evidence of the prisoner's wife and his sister's child tended to show that the shooting was accidental. Now, upon this evidence, was it not a question before the jury whether the shooting was purely accidental, or felonious and criminal? Was it not a question whether he procured this pistol, became really or pretendedly intoxicated, and went to his sister's home on the impulse of bad blood against his sister, flowing from her criticism of his conduct, and from his love for bad women, for the settled and premeditated purpose of killing his sister? Did not the state have the right to ask the jury to say whether the shooting was a lamentable accident, or a monstrous, sedate murder? Did it not have the right to ask the jury whether the prisoner made a false pretense of intoxication, to cover and screen a fixed purpose of murder? Did not the state have the right to ask the jury to say whether the prisoner's conduct with that self cocking, dangerous pistol, in the little room full of women and children, was so reckless of human life as to imply malice? If it had the right to propound these questions to the jury under the evidence, as clearly it had, did the state not have the right then to ask the court to say, as it did by these in-

structions, that under certain circumstances, if they existed, the prisoner was guilty of murder in the first degree, and under certain circumstances the act was murder? Did it not have the right to ask the court to say that if the act was intentional, intoxication would not excuse? To have it say that the intentional use of a deadly weapon would imply malice? Why, the very first question for the jury was whether the act was one of intention or accident, and yet the state is not allowed to present her theory of the degree of the act, if the jury should decide it to be intentional. Could it not have asked the court to tell the jury that it was to decide whether the shooting was of purpose or accidental? If so, why not allow her to ask it to say that if intentional, under certain circumstances, it would be murder in the first degree? What rights had the state? None, under the evidence, according to the foregoing opinion, unless it was to be silent, ask no instructions, and concede the acquittal of the prisoner. Now, note that I am not contending, and do not intend to intimate, *pro* or *con*, that the evidence was enough to convict the defendant; for all I intend to say is that there was enough ground, under the evidence, to allow the state to put her theory before the jury without having her instructions rejected as wholly and entirely unsustained by all or any evidence tending in any appreciable degree to sustain that theory. None of the state's instructions could have mislead the jury away from the question whether the killing was by accident, for the following instructions given at the prisoner's request fairly presented that question to the jury: "No. 2. The jury are instructed that the burden of proof is on the state to make out its case against the accused, Frank Cross, beyond a reasonable doubt, and if, on the whole evidence, there is a reasonable doubt remaining in the minds of the jurors of the guilt of the accused, Frank Cross, the jury should acquit him. "No. 7. The jury are instructed that it is necessary that it appear to them, from the whole evidence, that the accused, Frank Cross, committed the act charged, to wit, the killing of Ella Taylor, with malice, before they can convict the prisoner of murder, either in the first or second degree." "No. 9. The jury are instructed that if they be-

lieve from the evidence that the deceased came to her death from the discharge of a pistol at the time in the pocket of the prisoner, or while being placed in the pocket of the prisoner by him, or while in his possession, but which pistol was not maliciously or intentionally pointed or aimed at the deceased by the prisoner, or voluntarily discharged by him, and that these facts were entirely accidental, and without fault on the part of the defendant, and while he was not in the commission of an unlawful act, that then it is the duty of the jury to acquit the prisoner."