## STATE OF IOWA v. GEORGE MATHESON, Appellant.

**Evidence:** X-RAY PHOTOGRAPH. An X-ray photograph is admissible, as independent evidence to show the presence of a foreign substance in the human body.

**Same.** On an issue as to the course and position of a bullet the absence of evidence that the object revealed by an X-ray photograph was in fact a bullet and that it had not changed its location, is not an objection to the admission of the photograph.

**Admission of evidence:** PREJUDICE. The action of the trial court in overruling an objection to an inquiry of a witness on cross-examination, as to what he meant by a certain expression in his direct examination, which was not prejudicial to the defendant, will not be disturbed.

**Impeachment.** Where there is an inconsistency between the belief of a witness, as indicated by previous statements and that which would naturally be drawn from his testimony, such previous statements may be shown for the purpose of discrediting his evidence, although not directly contradictory.

**Admission of evidence:** PREJUDICE. On a prosecution for assault with intent to murder it was error to permit the cross-examination of defendant further as to his alleged statements that a theft, having a relation to the assault charged, was committed by a member of his family, although in view of the record perhaps without prejudice.

**Assault with intent to murder:** ACCIDENT: INTENT: INSTRUCTION. Where the defense to a prosecution for assault with intent to murder was that the shooting was accidental and without wrongful intent, it was error to charge, in effect, that unless the jury found affirmatively that the shooting was accidental they should disregard all evidence of accident and apply the rule as to presumption of intent arising from a wrongful act.

**Flight.** Flight of an accused is *prima facie* indicative of guilt.

**Jurors:** COMPETENCY: WAIVER. Objection to a juror because his name was not on the list before the jury was sworn, is waived by failure to inquire into his competency on the preliminary examination.

*Appeal from Pottawattamie District Court.*— HON. J. H.
PRESTON, Judge.

MONDAY, APRIL 10, 1905.

Rehearing denied Friday, April 27, 1906.

DEFENDANT was indicted and convicted for an assault
with intent to commit murder, and sentenced to imprison-
ment in the penitentiary for eight years at hard labor, and
from this sentence he appeals.— *Reversed.*

*J. P. Organ, Harl & Tinley,* and *Flickinger Bros.,* for
appellant.

*Charles W. Mullan,* Attorney General, and *Lawrence
De Graff,* Assistant Attorney General, for the State.

McCLAIN, J.— At a conference which was being held
in a secluded place between the defendant, a young man
nineteen years of age, and one Williams, in regard to the
stealing of some jewelry from the latter's store, at which one
Baker, who was an officer, and Henry Matheson, the father
of the defendant, and one other person, were present, a re-
volver which defendant had been carrying in his hip pocket,
and which he was at the time taking from his pocket, was
discharged, and Baker was wounded as a result of the dis-
charge.   The claim on behalf of defendant was that the
revolver was accidentally discharged whilst he was attempt-
ing to extract it from his pocket, while Baker testified that
it was intentionally aimed and discharged at him by the de-
fendant.

I. The ground on which defendant stood was a little
lower than that on which Baker stood, according to some of
the witnesses; and it was a material inquiry
whether the ball, which entered Baker's body
at the margin of the ribs, about an inch to the
right of the median line, took an upward or a downward

1. EVIDENCE:
X-ray photo-
graph.

course, for an upward course would indicate that the revolver was discharged while it was near the level of defendant's hip, and would tend to contradict the testimony of Baker that defendant aimed the revolver at him before it was fired, while a downward course would be consistent with Baker's account of what took place. The physician who probed for the bullet did not find it, but one Greenland, who testified that he was an electrical engineer, and familiar with the use of the X-ray machine, produced an X-ray photograph, or "radiograph," as it is called in his testimony, which he testified was produced by subjecting the middle portion of Baker's body to the proper process for taking a photograph of the interior thereof by means of the X-ray machine, which photograph showed the vertebræ of the spinal column in the lumbar region, and appeared to show a dark object in the shape of a bullet close to one of the vertebræ. One McRae, a physician, by means of a comparison of the spot where the bullet entered Baker's body with the location of the supposed bullet, as shown by the radiograph, testified that the course of the bullet was downward. To the admission of the radiograph in evidence the defendant objected, and the overruling of his objection is one of the alleged errors relied upon for reversal.

The principal objection urged to the introduction of the radiograph, and the use of it by the witness McRae for the purpose of determining the course of the bullet, is that it was not sufficiently identified as a representation of anything about which there was evidence before the jury. The theory of counsel seems to be that, in general, a photograph is admissible in evidence only as a representation of something which a witness testifies to as of his own knowledge, resulting from observation, and that as no witness testified to, or could testify to, the presence of a bullet lodged in Baker's body, near the spinal column, by any direct observation, the radiograph showing what appeared to be a bullet in that locality was not admissible.

It is true that photographs, like maps, diagrams, or other methods of representing visually the facts to which a witness directly testifies, or which might be directly observed by the jury if they had an opportunity to make inspection, have been held to be admissible simply as constituting such a representation. *Reddin v. Gates,* 52 Iowa, 210; *Ruloff v. People,* 45 N. Y. 213, 224; *Cowley v. People,* 83 N. Y. 464, 476 (38 Am. Rep. 464); *People v. Fish,* 125 N. Y. 136 (26 Pac. 319); *Baustian v. Young,* 152 Mo. 317 (53 S. W. 921, 75 Am. St. Rep. 462); *Dederichs v. Salt Lake City R. Co.* 14 Utah 137 (46 Pac. 656, 35 L. R. A. 802); *Hampton v. Norfolk & W. R. Co.,* 120 N. C. 534 (27 S. E. 96, 35 L. R. A. 808).

But the court takes judicial notice of the fact that by the ordinary photographic process a representation may be secured, sufficiently truthful and reliable to be considered as evidence with reference to objects which are in a condition to be thus photographed, without regard to whether they have been actually observed by any witness or not. As is said in *Luke v. Calhoun County,* 52 Ala. 115: " A court cannot refuse to take judicial cognizance that photography is the art [of] producing fac-similes or representations of objects by the action of light on a prepared surface. As such, it has been so long recognized, and the mechanical and chemical process employed, and the scientific principles on which it is based, are so generally known that it would be vain for a court to decline cognizance of it." And in *Udderzook v. Commonwealth,* 76 Pa. 340, 353, it is said that photography " has become a customary and common mode of taking and preserving views, as well as likenesses of persons, and has obtained universal assent to the correctness of its delineations. We know that its principles are derived from science; that the images on the plate, made by the rays of light through the camera, are dependent on the same general laws which produce the images of outward forms upon the retina through the lenses of the eye. The process has become one in general

use — so common that we cannot refuse to take judicial cognizance of it as a proper means of producing correct likenesses." Therefore a photograph is admissible not merely as a diagram or map representing things to which the witness testifies from his independent observation, but as direct evidence of things which have not been directly described by a witness as having come within his observation. Thus in *Barker v. Town of Perry,* 67 Iowa, 146, this court has said that, "wherever it is important that the *locus in quo* or any object be described to a jury, it is competent to introduce a photographic view." And in that case it was held not improper to allow the jury to take with them to the jury room a photograph which had been introduced in evidence, and make use of a magnifying glass in order to minutely observe those things which could be seen in the photograph by means of such glass. The magnifying glass was permitted in this case on the same principle as its use was allowed in *Frank v. Chemical National Bank,* 45 N. Y. Super. Ct. 452, and *Kannon v. Galloway,* 2 Baxt. 230 — for the purpose of discovering whether the signature to a written instrument introduced in evidence was genuine; and it is plain that the photograph was recognized as an independent instrument of evidence, the true significance of which might be discovered by means of the glass. And as a further illustration of the use of photographs as independent instruments of evidence, when properly identified, see, *Omaha Southern R. Co. v. Beeson,* 36 Neb. 364 (54 N. W. 557). It is apparently on the same principle that, in the comparison of signatures or purported signatures, enlarged photographic copies are admitted. *Luco v. United States,* 23 How. 515, 531, 16 L. Ed. 545; *Marcy v. Barnes,* 16 Gray, 161, 77 Am. Dec. 405; *Howard v. Illinois Trust & Savings Bank,* 189 Ill. 568 (59 N. E. 1106).

The process of X-ray photography is now as well established as a recognized method of securing a reliable representation of the bones of the human body, although they are

hidden from direct view by the surrounding flesh, and of metallic or other solid substances which may be imbedded in the flesh, as was photography as a means of securing a representation of things which might be directly observed by the unaided eye at the time when photography was first given judicial sanction as a means of disclosing facts of observation; and for that purpose X-ray photographs, or sciagraphs, or radiographs, as they are variously called, have been held admissible on the same basis as photographs. *Bruce v. Beall,* 99 Tenn. 303 (41 S. W. 445); *Miller v. Dunmon,* 24 Wash. 648 (64 Pac. 804); *Chicago & Joliet Elec. R. Co. v. Spence,* 213 Ill. 220 (72 N. E. 796); *Carlson v. Benton,* 66 Neb. 486 (92 N. W. 600); *City of Geneva v. Burnett,* 65 Neb. 464 (91 N. W. 275, 58 L. R. A. 287); 1 Wigmore, Evidence, sections 795–797. As is said in *Mauch v. City of Hartford,* 112 Wis. 40 (87 N. W. 816): " It is the duty of courts to use every means for discovering the truth reasonably calculated to aid in that regard. In the performance of that duty, every new discovery, when it shall have passed beyond the experimental stage, must necessarily be treated as a new aid in the administration of justice in the field covered by it. In that view, courts have shown no hesitation, in proper cases, in availing themselves of the art of photography by the X-ray process." We have no difficulty, therefore, in holding that the radiograph admitted in evidence in this case, after proof that it was taken by a competent person, was admissible to show that there was in the body of Baker, at the time it was taken, some hard substance, in the shape of a bullet, near the spinal column.

It is objected, however, that there is no evidence that this object which is represented in the radiograph was a bullet. True enough, but it was proper for the jury to take the evidence for what it was worth, as indicat-

2. SAME.

ing that something in the shape of a bullet was lodged in Baker's body. Whether it was in fact a bullet, they must determine, just as they would have been required

to determine the fact if the witness had testified that he saw something the size and shape of a bullet. That is all he could have told simply by looking at it if it had been exposed to view.

It is further objected that there was no evidence as to when the radiograph was taken, and therefore that it does not appear that the bullet, if such it was, occupied the same position in Baker's body that it did when it first lodged there after being fired from defendant's revolver. Of course, evidence as to the location of the bullet at a subsequent time would not be material, unless there was some reasonable ground for assuming that its location had not changed in the meantime; but we think that we can properly take judicial notice of the fact that a bullet imbedded in human flesh usually becomes encysted, and does not change its location without external interference; and it seems to us that the probability that the bullet when discovered by means of the radiograph was in the same position that it was when it first lodged in Baker's body is sufficiently strong to have warranted the jury in taking the information furnished by the radiograph for what it was worth, in their judgment, in determining whether the course of the bullet after entering the body was downward or upward.

II. Henry Matheson, the father of defendant, was a witness in his behalf, and, on cross-examination, testified that he told his son, if he knew anything more about the

3. ADMISSION OF EVIDENCE: prejudice.

stealing of the jewelry than he had already told, to tell it, and they would " fix it up "; and he was asked what he meant when he said that they would " fix it up." But as he put his own version on the conversation which he had related, and there was no effort to contradict him in this respect, we do not see that there was any prejudicial error in overruling the objection to the questions.

But he was also asked whether he did not say to one Hanson that " we had the thing fixed up when the boy shot

that deputy sheriff," and to one Swanson that "the boy got mixed up in that jewelry stealing, and now he has shot the deputy sheriff"; and, having made a qualified denial as to such statements, Hanson and Swanson were called as witnesses for the prosecution on rebuttal, and testified that the statements above quoted had been made to them, respectively, by the witness. Objections were made to the questions asked of the witness on cross-examination, and to the questions asked of Hanson and Swanson, respectively, in regard to these statements, which, as they testified, were made to them by him; and the question is whether the cross-examination laying the foundation for an impeachment, and the questions to the other witnesses for the purpose of showing these statements by way of impeachment, were properly admitted.

*4. IMPEACHMENT.*

It is true that previous statements made by a witness as to a matter of opinion or a conclusion cannot be shown for the purpose of impeachment, although they tend to contradict the inferences which might be drawn from the recital of the facts given in the witness' examination in chief. *People v. Stackhouse,* 49 Mich. 76 (13 N. W. 364); *Saunders v. City & Suburban R. Co.,* 99 Tenn. 130 (41 S. W. 1031); *Drake v. State,* 29 Tex. App. 265 (15 S. W. 725); *Welch v. State,* 104 Ind. 349 (3 N. E. 850). It is also said properly that the answer solicited by a witness on cross-examination as to collateral matter cannot be contradicted; "collateral matter" being defined to be a matter which the cross-examining party would not have been permitted to introduce in evidence as a part of his original case. *Hildeburn v. Curran,* 65 Pa. 59; *Johnston v. Spencer,* 51 Neb. 198 (70 N. W. 982); Welch v. State, *supra.* And of course the prosecution cannot show declarations of a third person which are against the defendant, even though the person who has made such declarations is called as a witness by the defendant. *State v. Keefe,* 54 Kan. 197 (38 Pac. 302). These cases are relied on, in a general way, in behalf of appellant, to support the propo-

sition that what may be called an indirect impeachment (that is, an impeachment by showing declarations of the witness indicating a general belief inconsistent with that indicated by his examination in chief) is not proper. And see *Pence .v. Waugh,* 135 Ind. 143, 156 (34 N. E. 860); *Ross v. Commonwealth,* 21 Ky. Law. 1344 (55 S. W. 4). But the great weight of authority seems to support the proposition that if there is an inconsistency between the belief of the witness, as indicated by his previous declarations, and that which would naturally be indicated by his examination in chief, such previous declarations may be shown, although they are not directly contradictory of any specific statement made on his examination in chief. *Patchin v. Astor Mut. Ins. Co.,* 13 N. Y. 268; *State v. Kingsbury,* 58 Me. 238; *Handy v. Canning,* 166 Mass. 107 (48 N. E. 118); *Whipple v. Rich,* 180 Mass. 477 (63 N. E. 5); *McClellan v. Ft. Wayne & I. R. Co.,* 105 Mich. 101 (62 N. W. 1025); *Lowe v. State,* 118 Wis. 641 (96 N. W. 417); *State v. Baldwin,* 36 Kan. 14 (12 Pac. 318); *Franklin v. Commonwealth,* 105 Ky. 237 (48 S. W. 986); *Chicago & N. W. R. Co. v. De Clow,* 124 Fed. 142, 61 C. C. A. 34.

We think there was no error, therefore, in allowing the prosecution to inquire about and prove these prior declarations of Henry Matheson, for he had, in his examination in chief as a witness for the defendant, testified that he did not see his son, the defendant, take his pistol out of his pocket or aim it at Baker, although he was in a position to have seen such acts on the part of defendant. The whole course of the witness' testimony had tended to support the contention of defendant that the revolver was not intentionally fired, and, if his testimony was true, he must have entertained the belief that it was not thus fired, and his previous declaration that the defendant had shot Baker was inconsistent with any such belief. At least, there was such apparent inconsistency as to make it proper to admit the declarations for what they were worth.

This witness was also asked on cross-examination as to a previous declaration tending to indicate that the person guilty of the theft of the jewelry was a member of his own family. This was clearly improper, for such declaration could do no more than prove the belief of defendant that his son was implicated in the theft of the jewelry. But as the witness unqualifiedly denied any knowledge of making such a remark, and there was no subsequent effort on the part of the prosecution to prove that it was made, the error in allowing the question to be asked on cross-examination was perhaps without prejudice.

5. ADMISSION OF EVIDENCE: prejudice.

III. The court instructed the jury that the law presumes innocence; that it is incumbent upon the state, in order to sustain a conviction, to prove the guilt of defendant beyond any reasonable doubt, etc.; and that mere weight of evidence is not sufficient, unless it excludes all reasonable doubt, etc.— and then proceeded to define murder, manslaughter, assault, etc., saying, that malice aforethought might be inferred from the kind of weapon used, and the manner and circumstances attending its use. In another instruction it is said that " the law warrants the presumption or inference that a person intends the results or consequences to follow an act which he intentionally commits which ordinarily do follow such acts," and that " if a person makes an assault on another, and inflicts on him an injury of a more serious character than an ordinary battery, the presumption is warranted that he intends to inflict a great bodily injury, if there is no evidence tending to show that he intended a less injury. If you find that defendant committed the assault charged, you will determine his intent in doing so by the surrounding circumstances, and all the evidence in the case before you which tends to show the intent." A subsequent instruction with reference to accidental shooting was as follows:

6. ASSAULT WITH INTENT TO MURDER: accident: intent: instructions.

It is claimed by the defendant that the pistol in question, at the time and place in question, was accidentally discharged. An accident may be defined to be an event happening without the concurrence of the will of the person by whose agency it was caused. If you find from all the facts and circumstances in evidence before you that the pistol in question was discharged by the defendant, and that the said J. C. Baker was shot thereby, and that the discharge of said pistol was without the concurrence of the will of the defendant, then it was an accident, and defendant would not be guilty of any crime. If you fail to so find, then you should disregard the theory of an accident, and inquire as to the guilt or innocence of the defendant, as hereinbefore instructed.

It is to be borne in mind that the theory of the defense was that defendant was innocent of any wrongful intent, and that his revolver was accidentally discharged. This was not a defense by way of justification or excuse, but, if true, it completely negatived the commission of any crime. Yet the court told the jury that, if they failed to find from the evidence that defendant's pistol was accidentally discharged (that is, without the concurrence of defendant's will), then they should *disregard the theory of an accident,* and inquire as to the guilt or innocence of the defendant, as already instructed.

Now, it seems to us this instruction was fundamentally wrong. Any evidence bearing on the question whether the defendant intentionally fired the pistol was evidence going to the very essence of the crime. Unless the jury found beyond a reasonable doubt that the pistol was intentionally, and not accidentally, fired, then it would be their duty to acquit; yet they are told, in effect, that, unless they find affirmatively — that is, by a preponderance of evidence — that the pistol was accidentally discharged, they are not to take into account the evidence as to an accident, but are to apply the rule as to presumption of intent from a wrongful act which had been given in preceding instructions. In

other words, it seems to us the effect of this instruction was to practically say to the jury that, unless the defendant proved by a preponderance of the evidence that the shooting was accidental, they should presume guilt from the fact of the discharge of the pistol and the injury to Baker. Possibly a critical analysis of the previous instructions would not necessarily lead to this conclusion, but, to avoid any such danger, the court should at least have embodied in the instruction last quoted a statement that defendant should not be convicted if, on all the evidence, including that tending to show that the shooting was accidental, they were satisfied beyond a reasonable doubt that the pistol was intentionally, and not accidentally, discharged. This conclusion has direct support in the cases involving the question of accidents. Thus in *State v. Cross,* 42 W. Va. 253 (24 S. E. 996), it is said: " The claim that the killing was accidental goes to the very gist of the charge, and denies all criminal intent, and throws on the prosecution the burden of proving such intent beyond a reasonable doubt." Even as to self-defense, which does not negative the intentional act, but excuses it, the uniform rule in this state is that the burden of proof (providing, of course, there is some evidence tending to show that the act was done in self-defense) is on the prosecution, and that it is erroneous to instruct the jury in such a way as to throw the burden of proving self-defense by a preponderance of the evidence on the defendant. *State v. Shea,* 104 Iowa, 724, and cases there cited. And see *People v. Arnold,* 15 Cal. 476; *Trogdon v. State,* 133 Ind. Sup. 1 (32 N. E. 725). Even as to alibi, with reference to which a somewhat anomalous rule has been adopted by this court, the jury should be instructed that the defendant is entitled to acquittal if, on all the evidence, including the evidence relating to an alibi, there is a reasonable doubt as to defendant's guilt. *State v. McGarry,* 111 Iowa, 709; *State v. Hogan,* 115 Iowa, 455. Further argument is unnecessary to substantiate the proposition that the trial court erred in telling

the jury that they should disregard the evidence as to accident unless they should affirmatively find that the pistol of defendant was accidentally discharged, without at least saying also that evidence of accidental shooting was to be considered in determining whether 'there was reasonable doubt of defendant's guilt.

IV. Complaint is made of an instruction relating to evidence that defendant fled after Baker was shot, but the instruction was that such fact was a circumstance *prima facie* indicative of guilt. Such an instruction 7. FLIGHT. is justified by *State v. Seymour,* 94 Iowa, 699, and *State v. Arthur,* 23 Iowa, 430, and is not condemned in *State v. Poe,* 123 Iowa, 118. In the case last cited it was held that it was error to charge that the jury might consider flight as evidence of guilt, but the distinction between such an instruction and one telling the jury that flight is a circumstance *prima facie* indicative of guilt was pointed out.

V. It is further urged that one of the jurors was ineligible for the reason that his name was not upon the jury list, and that he was not called as a juror until after defendant had exhausted all of his peremptory 8. JURORS: competency: waiver. challenges. The objection is predicated on a showing in the record that the name of the juror included in the list was John S. Davis, while the name of the juror called was Joseph S. Davis, and it further appears that there was no John S. Davis in the precinct in which Joseph S. Davis resided. It is sufficient to say that, if this discrepancy in name was a ground of challenge, it should have been ascertained on the preliminary examination of the juror, so that he could have been challenged for cause if the disqualification was made to appear. Having failed to investigate the incompetency of the juror in this respect in the preliminary examination, the defendant could not afterwards complain. *State v. Pickett,* 103 Iowa, 714; *State v. Greenland,* 125 Iowa, 141.

For the error which has been pointed out in this opinion, the conviction is set aside, and the case is remanded to the lower court for a new trial.— *Reversed.*