STATE of Iowa, Appellee,

v.

Lester Donald HOLDERNESS, Appellant.

No. 62689.

Supreme Court of Iowa.

June 18, 1980.

John M. Heckel of Klinger, Heckel & Robinson, Cedar Rapids, and White & Stone, Marion, for appellant.

Thomas J. Miller, Atty. Gen., Lona Hansen, Asst. Atty. Gen., and Eugene J. Kopecky, Linn County Atty., for appellee.

Considered by REES, P. J., and UHLEN-HOPP, McCORMICK, McGIVERIN and LARSON, JJ.

UHLENHOPP, Justice.

This burglary appeal involves a procedural question and two substantive questions: (1) whether in ruling on a motion for a directed verdict a court considers all the evidence in the record at the time the ruling is made or only the evidence in the record at the time the motion was originally made; (2) whether the foundation evidence here was sufficient for admission of a photograph into evidence; and if the foundation was sufficient, (3) whether the photograph was sufficient to sustain a finding that the defendant was the burglar.

Charles J. Corrigan has been an insurance adjuster for twenty-eight years, has used a camera in his work, has taken about three full rolls of pictures a week over that period, and has demonstrated familiarity with photography.

During the week which ended June 17, 1978, Corrigan took eight pictures with a company Instamatic camera, leaving four pictures to be taken on a twelve-exposure roll of film. The camera was equipped with flash for night pictures.

On the night of June 17, 1978, Corrigan's car was in his rented garage near his house, with the garage doors closed. In the car Corrigan had a CB unit and his black briefcase. In the briefcase he had company forms and drafts, a small flat black calculator, and the Instamatic camera containing the twelve-exposure film.

About 9:00 a. m. on June 18, 1978, Corrigan saw that his garage doors were open, although no one had permission to open them or to remove anything from the garage. He discovered that the CB and briefcase with contents had been stolen from the car by someone.

About two hours later a small boy in the neighborhood brought Corrigan a roll of film of the kind which he had in the camera.

In the ordinary course of his work, Corrigan sent the roll of film to the developer. This procedure had produced accurate pictures over the years. The developed prints with the negatives came back in the usual way. Corrigan recognized pictures one through eight from the roll as the ones he had taken in his employment. But the roll produced two more pictures, apparently taken with the flash. Number nine was a downward shot of the legs and feet of a standing person who appeared to be wearing cutoff trousers. This picture does not seem to be of significance to the case. But number ten (Exhibit 2) was a picture of a man on his knees looking sideways toward the camera and holding a black briefcase partially open and a small black flat object. In the background of the picture appeared a building with an open door, a trash-can rack, and a boat bearing license number IA 7086D. Corrigan did not recognize the man in picture ten. He did however positively identify the boat in the picture as his boat from its license number, and he also testified:

Q. Can you tell the jury where that photograph was taken as far as the scene? A. It was taken in my back yard, adjacent to the alley.

Q. How far from your garage? A. Oh, from the garage that was opened up it was about 30 feet.

He also identified the open garage door and the trash-can rack in the picture. He testified that the briefcase in the picture looked "exactly like" his briefcase which contained the camera. He testified the black object in the man's hand looked similar to his calculator.

Corrigan examined the negatives (Exhibit 3) containing the pictures in question, along with the prints, and stated that the negatives were exactly as reproduced in the prints. As to the strip containing the negatives he testified:

Q. Has it been modified, changed, altered in any way since [its return from the developer]? A. Not to my knowledge.

Q. It appears in the same condition and is the same as when you received it back in the ordinary course of your business? A. That's right.

Q. I would ask you to again examine the film in the State's Exhibit 3 carefully, and after examining it could you tell the jury if it has been altered or modified or touched in any way that you can determine? A. No, it hasn't not that I can determine.

Corrigan was asked:

Q. Examining, then, a very large quantity of prints that you have taken pictures of in your work, have you ever had a print come back that has been modified, altered, or changed? A. Never seen one come back altered or modified or changed.

Q. They have always accurately represented the picture, the subject that you took the picture of? A. Yes.

Regarding the particular Instamatic, Corrigan testified:

Q. Have you ever had any problems with it as far as not taking accurate pictures? A. No, it was a good camera.

He also stated the camera had no distortions he was aware of.

Corrigan testified he could identify the boat and the briefcase and that the crucial picture, Exhibit 2, accurately represents those two items. He was then asked:

Q. There does not appear to be any distortion or change or modification of them in the photo, does there? A. None.

Then to the question, "If part of the photograph is accurate, you have had the experience that the whole photograph was accurate?" he replied, "Right."

Exhibit 2, the picture of the man, was enlarged from the negative, as Exhibit 4. The prosecutor asked Corrigan:

Q. Did that enlargement accurately and fairly represent the picture that was shown in the negative? A. Yes, it did.

Numbers eleven and twelve on the roll of film were not exposed.

Also introduced in evidence was a photograph, Exhibit 5, which was established to be a picture of defendant Lester Donald Holderness; it was taken in booking him, and consists of side and front views. The side view is from an angle similar to Exhibit 2. The jury could find that Exhibits 2 and 5 are pictures of the same individual. They are of a young, pale male with very curly hair, wearing glasses. The facial features and glasses appear to be the same in the two exhibits. Defendant testified he had previously had his hair curled.

Throughout the proceedings defendant denied that he was at the Corrigan property or stole the items involved. His testimony was weakened somewhat by contradictions on cross-examination, but he did not admit the burglary. In addition, he testified on cross-examination regarding the picture of the individual in Exhibit 2:

Q. It has got your facial features and cheekbone? A. Yeah.

Q. It has got your Afro hair. A. Uh-huh.

Q. It has got your glasses, wire rims with the frames coming in right below the top. A. Yes.

In addition:

Q. It looks like you, doesn't it? A. Yes.

The county attorney charged defendant with second-degree burglary, and at trial defendant objected to the offer in evidence of Exhibit 2 on the ground among others of insufficient foundation proof in specified particulars. The trial court overruled the objection. Defendant also moved for a directed verdict on the ground among others of insufficient evidence that he is the person who committed the burglary. The court overruled the motion. The jury found defendant guilty, and he appealed after sentence.

I. *Evidence to be considered.* Defendant made a motion for directed verdict at the end of the State's evidence and again at the end of all the evidence. Under prior law this was the required practice; if a defendant made his motion at the end of the State's case, the court overruled it, and the defendant introduced evidence, the motion was waived. To preserve error the defendant had to make another motion at the end of all the evidence, and the court then considered all the evidence. *State v. Tibbits*, 207 Iowa 1033, 1035, 222 N.W. 423, 424 (1928).

Present rule 18(8)(a) of the Rules of Criminal Procedure states, however:

The court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the prosecuting attorney is not granted, the defendant may offer evidence without having waived his or her right to rely on such motion.

Under this rule, when the defendant moves for a directed verdict at the end of the State's evidence, the court must grant the motion if the evidence is insufficient to sustain a conviction. But if the court overrules the motion and the defendant introduces evidence, two questions arise: (1) must the defendant renew the motion at the end of the evidence as under prior law? and if not, (2) what evidence does the appellate court (and trial court) consider in determining whether the evidence is suffi-

cient to convict the defendant—the evidence in the record when the State originally rested or when both parties rested?

▮ As to the first question, rule 18(8)(a) clearly states that the defendant does not waive the motion by introducing evidence. Hence we will no longer have cases in which a defendant fails on appeal because he overlooked renewing his motion at the end of all the evidence. *See State v. Evans*, 248 N.W.2d 521, 522 (Iowa 1976). Thus he may rely on his unrenewed motion in posttrial motions and on appeal. As to the second question, however, we would have an artificial situation if a court had to close its eyes to part of the evidence which was in fact introduced. Although we recognize that some courts hold the other way, we adhere to the rule that a court considers all the evidence which is in the record. *State v. Robinson*, 288 N.W.2d 337, 340 (Iowa 1980). *See State v. Olson*, 161 N.W.2d 858, 859–60 (S.D.1968) ("Defendant did not rest upon his motion, but presented evidence after denial thereof and rebuttal evidence was introduced by the state. The denial of a motion for directed verdict for failure of proof is not reversible error if proof is afterwards supplied by either party. The introduction of evidence by defendant is not deemed a waiver of the motion. This court, however, considers *all the evidence* in determining whether denial of the motion was reversible error." Emphasis added.). We thus consider both the State's and defendant's evidence here.

▮ II. *Admissibility of Exhibit 2.* The jury could compare the man in Exhibit 2 with the man in Exhibit 5 who was proven to be defendant, and it could also compare the man in Exhibit 2 with defendant on the stand. But all this hinged on the admissibility of Exhibit 2. The State overwhelmingly established the corpus delicti, but Exhibit 2 constituted the only proof of the identity of the burglar. Did the State lay a sufficient foundation for Exhibit 2 to permit the jury to consider and weigh it, as the trial court and the Court of Appeals held? Trial courts have discretion to decide whether sufficient foundation has been laid

for admission of photographs, but must of course act within that discretion. *Hansen v. Franklin County*, 247 Iowa 1287, 1291, 78 N.W.2d 805, 807 (1956).

▮ A. To obtain admission of a photograph into evidence, (1) the picture must be relevant to the controversy, which normally requires that the picture be identified in time and place, *State v. Fuhrmann*, 257 N.W.2d 619, 624 (Iowa 1977); *State v. Brewer*, 247 N.W.2d 205, 213–14 (Iowa 1976), and (2) the picture must fairly represent what it shows. *State v. Deering*, 291 N.W.2d 38, 40 (Iowa 1980). Conventionally these foundation elements are shown by the direct testimony of a person who, although perhaps not connected with the photography, observed the scene and testifies that the picture fairly shows it, or who describes the photographic process employed and testifies it produces accurate pictures. 29 Am. Jur.2d *Evidence* § 788 (1967); 32 C.J.S. *Evidence* § 715, at 1014–15 (1964); *Annot.*, 9 A.L.R.2d 899, 900–01 (1950). These of course are the easier cases.

The harder cases are those in which direct testimony is not available and the proponent must rely on circumstances to lay a foundation for admission. The American Law Institute adopted a general rather than mechanistic test for the admissibility of photographs. It included a photograph within the definition of a writing. Rule 1(17), Model Code of Evidence (1942). It then stated in rule 601(a): "A writing, offered in evidence as authentic, is admissible if . . . sufficient evidence has been introduced to sustain a finding of its authenticity. . . ." In similar vein the framers of the later Federal Rules of Evidence adopted a general rather than rigid approach in rule 901(a) and (b)(4):

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentica-

tion or identification conforming with the requirements of this rule:

. . . .

(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

In this case the record does not contain testimony of a person who observed what Exhibit 2 shows—a man crouched by a boat opening a briefcase. The record does contain some testimony by Corrigan regarding the reliability of the Instamatic camera and the photographic process. For the most part, however, Corrigan's testimony is comprised of circumstantial evidence.

A number of decisions, some recent, deal with problems similar to this one. One of the earlier cases dealing with the situation in which no witness actually saw what the picture shows was a decision of this court, *State v. Matheson*, 130 Iowa 440, 103 N.W. 137 (1905) (X-ray). An electrical engineer testified that the picture was taken of the victim's body. This court acknowledged that no one had seen what the picture showed but nonetheless upheld admission of the X-ray picture, stating:

But the court takes judicial notice of the fact that by the ordinary photographic process a representation may be secured, sufficiently truthful and reliable to be considered as evidence with reference to objects which are in a condition to be thus photographed, without regard to whether they have been actually observed by any witness or not. As is said in *Luke v. Calhoun County*, 52 Ala. 115: "A court cannot refuse to take judicial cognizance that photography is the art [of] producing facsimiles or representations of objects by the action of light on a prepared surface. As such, it has been so long recognized; and the mechanical and chemical process employed, and the scientific principles on which it is based, are so generally known that it would be vain for a court to decline cognizance of it." And in *Udderzook v. Commonwealth*, 76 Pa. 340, 353, it is said that photography "has become a customary and common mode of taking and preserving views, as well as likenesses of persons, and has obtained universal assent to the correctness of its delineations. We know that its principles are derived from science; that the images on the plate, made by the rays of light through the camera, are dependent on the same general laws which produce the images of outward forms upon the retina through the lenses of the eye. The process has become one in general use—so common that we cannot refuse to take judicial cognizance of it as a proper means of producing correct likenesses." Therefore photographs are admissible not merely as a diagram or map representing things to which the witness testifies from his independent observation, but as direct evidence of things which have not been directly described by a witness as having come within his observation.

*Id.* at 443–44, 103 N.W. at 138.

A leading case in this area is *People v. Doggett*, 83 Cal.App.2d 405, 188 P.2d 792 (1948). Evidence was introduced which warranted a finding that the defendants took pictures of themselves committing certain illegal acts, that the pictures were not composites, that the defendants were the persons in the pictures, and that physical objects in the pictures were in the defendants' apartment. The court upheld admission of the pictures and stated:

The essential element is that it be shown in some way that the picture does correctly depict what it purports to show, in other words that it be verified or authenticated as a genuine picture of what it purports to depict. This being the purpose it is not required that the photographer himself be produced where other evidence is available to accomplish the same end. The effect and probative value of such other evidence is the important consideration, and not that the way or manner of making the requisite showing should be exactly the same in all cases.

There is no reason why the essential element should not be shown in a particular case by other evidence which varies

somewhat from the usual pattern, provided it is sufficient to give an equally satisfactory result. There is no reason why it should not be shown by the testimony of witnesses, assisted by other matters, including those which are an inherent part of the picture itself, aside from the relative matter which it purports to depict, provided these other or inherent matters reliably appear and provided that they, with the testimony, sufficiently disclose the authenticity and genuineness of the photograph.

*Id.* at 409–10, 188 P.2d at 794–95.

Another case in which no one testified to having seen what the picture showed is *Ferguson v. Commonwealth*, 212 Va. 745, 187 S.E.2d 189, *cert. denied*, 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972). A store was equipped with a "Regiscope" which, according to the testimony, photographed individuals who presented checks. This particular photograph purported to show a person the Commonwealth claimed was the defendant, presenting the check in question; the defendant was not otherwise identified by evidence. Upon evidence relating to the process of taking and developing Regiscope pictures, the court held the picture admissible. *Id.* at 747, 187 S.E.2d at 190.

A similar decision is *United States v. Gray*, 531 F.2d 933 (8th Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 117, 50 L.Ed.2d 110 (1976). The court there stated:

Defendant complains that the Regiscope photograph taken at the supermarket when the check was cashed was admitted without proper foundation. The photograph in question shows in a single print both the check and the person who presented it. The operation of the Regiscope was described in detail by the supermarket cashier and by the owner of the Regiscope Check Control Company which rented the machine to the store and developed and printed the film. The cashier testified that she had cashed the particular check and had taken the photograph. She admitted that she had no independent recollection of the appearance of the man who presented the check.

The defendant urges that the photograph can be admitted only if the cashier or someone else present when it was taken can testify that it is a fair and accurate representation of William Gray as he appeared when the picture was taken. The cashier's testimony was sufficient to allow the court to find that the photograph was taken when the forged check was passed and that the person pictured was the one who passed it. Under the circumstances, it is for the trier of fact to determine whether the defendant was the man in the photograph.

*Id.* at 935. *See also, State v. Deering*, 291 N.W.2d 38 (Iowa 1980).

Another case, involving a bank robbery, is *United States v. Taylor*, 530 F.2d 639 (5th Cir.), *cert. denied*, 429 U.S. 845, 97 S.Ct. 127, 50 L.Ed.2d 117 (1976). The problem presented and the court's response appear in this excerpt:

In the case before us it was, of course, impossible for any of the tellers to testify that the film accurately depicted the events as witnessed by them, since the camera was activated only after the bank personnel were locked in the vault. The only testimony offered as foundation for the introduction of the photographs was by government witnesses who were not present during the actual robbery. These witnesses, however, testified as to the manner in which the film was installed in the camera, how the camera was activated, the fact that the film was removed immediately after the robbery, the chain of its possession, and the fact that it was properly developed and contact prints made from it. Under the circumstances of this case, we find that such testimony furnished sufficient authentication for the admission of the contact prints into evidence. Admission of this type of photographic evidence is a matter largely within the discretion of the court, *Moore v. Louisville & Nashville R. R. Co.*, 223 F.2d 214, 216 (5th Cir. 1955), and it is clear that the district court did not abuse its discretion here. *See People v. Bowley*,

59 Cal.2d 855, 859, 31 Cal.Rptr. 471, 382 P.2d 591, 594 (1963), where the California Supreme Court recognized that in certain instances photographs may be admissible as probative evidence in themselves, rather than solely as illustrative evidence to support a witness' testimony, provided that sufficient foundation evidence is adduced to show the circumstances under which it was taken and the reliability of the reproduction process.

*Id.* at 641–42.

An Indiana court thoroughly discussed the subject of foundation evidence in *Bergner v. State*, 397 N.E.2d 1012 (Ind.App. 1979). The conventional methods of authenticating pictures could not be used, but the court found the foundation sufficient on this basis:

> There were three main grounds used by the State to establish the foundation. They clearly demonstrate a sufficient degree of authenticity for the admission of the photographs.
>
> First, there was expert testimony to show the photographs had not been altered in any way. Barry Mones, the photographic examiner for the F.B.I., stated his examination and testing of the photographs revealed they were not retouched nor composites.
>
> Second, the approximate date the photographs were taken was shown to be October, 1976. Appellant's ex-wife, X, testified to this based on her daughter's haircut in the picture. The haircut was memorable because it had been given, ineptly, by X's son. This evidence was corroborated by Barry Mones' testimony regarding the date of manufacture of the film. He stated Exhibit 1 was manufactured in August, 1966 or 1976, and Exhibit 2 was produced in January, 1964 or 1974. He also stated Polaroid film has a relatively short life, thus leaving an inference that the later dates are more likely the actual dates of manufacture.
>
> Finally, there was strong testimony regarding the identification of the two persons in the photographs. X unequivocally identified her daughter, Y, and portions of the living room of the home she shared with appellant during their marriage. She also identified appellant on the basis of a robe she had purchased for him, and her knowledge of the general shape of his lower body and hernia scar. X's recognition of the scar was reinforced by the testimony of Detective Mitchell who stated appellant's scar was "consistent with" the one in the photograph.

*Id.* at 1018.

Perhaps the closest case factually to the present one is *United States v. Stearns*, 550 F.2d 1167 (9th Cir. 1977). Two small ships were anchored at Palmyra. One of them, the *Iola*, the defendants' vessel, was disabled. Two persons were on the other ship, the *Sea Wind*, but they disappeared. The latter ship was later seen at Hawaii.

The defendants were charged with theft. The jury could find the defendants left a roll of film to be processed in Hawaii. The Government obtained the developed pictures. The pictures showed in part a vessel in tow, claimed by the Government to be the *Iola* towed by the *Sea Wind*. This if true would rebut a defense the defendants interposed. In holding the pictures admissible, the court stated in part:

> Part of the evidence bearing on authentication is circumstantial, derived from testimony about other matters. A critical part of the foundation, that relating to time, is derived only by referring to one of the photographs. In this respect the case is rather unusual, for that photograph by itself establishes a necessary element of its authenticity. No witness testified explicitly, during the Government's case in chief, where or when the pictures were taken or what they represented. Even if direct testimony as to foundation matters is absent, however, the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence. Other courts have recognized that a photograph may have probative value that is indepen-

dent of amplification by other testimony. *United States v. Taylor*, 530 F.2d 639 (5th Cir. 1976); *People v. Bowley*, 59 Cal.2d 855, 31 Cal.Rptr. 471, 382 P.2d 591 (1963). While these authorities have not considered whether a photograph can be used to make inferences bearing on its own foundation, we see no logical reason that restricts us from so holding in the case before us. *Cf.* Notes to Fed.R.Evid. 901 of Advisory Committee on Proposed Rules, Example (6).

There was ample evidence in the Government's case to show that the *Iola* remained in Palmyra harbor from the time it arrived in Palmyra until the time it left. It is therefore clear the *Iola* could have been photographed on the open sea only at two distinct times: either before the *Iola* reached Palmyra, or after its departure from the harbor during Stearns' and Walker's return voyage to Hawaii.

The crucial photograph is the one showing the blue and white *Iola* on the open seas, with the rigging of the *Sea Wind* in the foreground. Particularly significant is the red net shown on the *Sea Wind* in the photograph. The Government in its case in chief demonstrated that the *Iola* was equipped with the red net to prevent Stearns' and Walker's dogs from falling overboard when it anchored at Palmyra. It could therefore be inferred that Stearns and Walker used the net for the same purpose on the *Iola's* voyage from Hawaii. The Government established by testimony that the net on the *Sea Wind* in the foreground was the same net that had been on the *Iola*. Since the evidence presented in the Government's case indicated that the *Iola* and the *Sea Wind* arrived at Palmyra four or five days apart and that their respective crews had no contact until the two vessels were moored in Palmyra harbor, it follows that the *Sea Wind* could not have been equipped with the *Iola's* net until its return voyage to Hawaii. The picture showing the red net on the *Sea Wind* and its absence on the *Iola* thus establish that

the photograph was taken on the return voyage.

*Id.* at 1171.

B. Turning to the present evidence, the State introduced sufficient proof as to the relevancy of Exhibit 2—identifying the time and place the picture was taken in relation to the burglary. On the evening of June 17 Corrigan had placed his car in his garage with the garage door closed and the briefcase in the car. The next morning at about 9:00 a. m., the garage doors were open and the briefcase was gone. In about two hours a boy brought Corrigan the film which turned out to be the one from his camera; it contained the eight exposures Corrigan himself had taken. The tenth exposure was Exhibit 2. That exposure must have been made, the court could find, during the night of June 17—the night the briefcase was stolen.

Moreover, the court could find that Exhibit 2 must have been taken in Corrigan's yard near the garage. Corrigan positively identified his boat and trash-can rack in the picture.

Under the decisions we have considered, the State also introduced sufficient proof that the photograph was not distorted or inaccurate. Over a twenty-eight year period Corrigan had caused film to be developed in connection with his business, with accurate results. The pictures had never come back modified, altered, or changed. That procedure was used here. He also testified that the Instamatic containing the film produced reliable pictures and that the prints in this instance were accurate reproductions of the negatives. Corrigan saw no distortion, change, or modification in the developed photograph Exhibit 2.

■ We hold the evidence is "sufficient to support a finding that the [photograph] is what [the State] claims"—a picture of the burglar. The Court of Appeals correctly concluded that the trial court acted within its discretion in admitting Exhibit 2.

■ III. *Sufficiency of evidence.* Photographs can be used in two main ways: to illustrate the testimony of witnesses, or as

substantive proof themselves. *Matheson,* 130 Iowa at 444, 103 N.W. at 138. *Accord, Gray,* 531 F.2d at 935; *Taylor,* 530 F.2d at 642; *People v. Bowley,* 59 Cal.2d 855, 861, 31 Cal.Rptr. 471, 476, 382 P.2d 591, 595 (1963); *Bergner,* 397 N.E.2d at 1017; *Ferguson,* 212 Va. at 746, 187 S.E.2d at 190; III J. Wigmore, Evidence § 790, at 220 (Chadbourn rev. 1970); E. Cleary, McCormick's Handbook on Evidence § 214, at 531 (2d ed.1972). Here the photograph was used as substantive proof of identity.

■ To support a conviction the evidence must be such, when considered as a whole in the light most favorable to the prosecution, that a reasonable person could find guilt beyond a reasonable doubt—in this instance, that defendant was the burglar, the contested issue in the case. *State v. Robinson,* 288 N.W.2d 337, 341 (Iowa 1980). While the jury was not bound to find guilt, the remarkable likeness of defendant in Exhibit 5 to the man in Exhibit 2, taken with the contradictions and admissions in defendant's own cross-examination, persuade us that a reasonable person could find guilt beyond a reasonable doubt in the light of the evidence as a whole.

We thus uphold the verdict and sentence.

AFFIRMED.