# IN THE COURT OF APPEALS OF IOWA

No. 23-1390
Filed February 19, 2025

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**TERENCE EDWARD MANNING JR.,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Heather Lauber, Judge.

A defendant appeals his conviction for willful injury causing serious injury.

**REVERSED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**TABOR, Chief Judge.**

Invoking the "silent witness" doctrine, the district court allowed the State to admit into evidence a police body camera recording of a surveillance video showing Terence Manning, Jr., punching and kicking another man in a convenience store parking lot. After seeing that video, the jury convicted Manning of willful injury causing serious injury. On appeal, Manning claims that the court should have excluded the video exhibit based on his authentication and best-evidence objections. He also challenges the sufficiency of the State's evidence that he specifically intended to inflict serious injury. We find substantial evidence of Manning's specific intent. But because the district court erred in admitting the surveillance video without proper authentication, and that error was not harmless, we reverse Manning's conviction and remand for a new trial.

## I.     Facts and Prior Proceedings

"I will put you to sleep. I'll kill you. I will knock you out." Manning uttered those threats, according to S.M., as he attacked S.M. on a late-December night in 2022. S.M. and his fiancée, M.B.M., had agreed to give Manning a ride to his mother's house.[1] S.M. recalled that Manning was "being disrespectful" during the drive, so M.B.M. pulled into a QuikTrip parking lot and S.M. told Manning to leave the vehicle.[2] Manning refused. S.M. then got out of the passenger seat and tried to pull Manning's rear door open "two or three times." But Manning "kept pulling

---

[1] Manning was the boyfriend of M.B.M.'s daughter.
[2] M.B.M. was driving, S.M. was in the passenger seat, and Manning was in the backseat on the driver's side.

the door back closed." S.M. recounted that after telling Manning four times to get out, Manning "started punching [him] in the face."

Surveillance footage of the parking lot showed Manning opening his door as S.M. walked around the back of the vehicle. As S.M. approached, Manning got out and punched him. S.M. fell to the ground. While he was on the ground, Manning punched S.M. a second time in the head. When S.M. tried to get up, Manning pushed him back to the ground and kicked him in the head twice. After Manning turned around and started walking back toward the vehicle, S.M. stood and stumbled forward with his hands up. Manning then turned around, advanced toward S.M., and punched him a final time in the head. S.M. fell to the ground again, hitting his head on the pavement.

Two police officers responded to the scene after the store clerk called to report the assault. When the officers arrived, S.M. was inside the store. He was "covered in blood" and had a "very swollen lip, very swollen facial features, cheek, [and] eye." One of the officers, Joshua Leibold, spoke with S.M. and M.B.M. about what happened and photographed S.M.'s injuries. The other officer, Jackson Bruckner, spoke with the clerk and watched the surveillance footage of the parking lot. Officer Bruckner's body camera recorded the surveillance video being played as he watched it on a screen behind the store counter.

Officer Leibold arrested Manning after he was found at another convenience store. Manning told the officer that he felt like he'd "been set up" and that S.M. tried to "throw [him] out [of] the car repeatedly." He also said that S.M. "got in the front seat and tried to start smacking [him] from the front seat to the back seat." He admitted that he "knocked [S.M.] to the ground" after leaving the car. But he

insisted that "the video evidence" would show that he "defended" himself and that S.M. was "the aggressor."

The State charged Manning with willful injury causing serious injury, a class "C" felony, in violation of Iowa Code section 708.4(1) (2022). Manning pleaded not guilty. The case went to jury trial in June 2023.

Over defense objections, the district court allowed the State to present the body camera recording of the QuikTrip surveillance video through Officer Bruckner's testimony. The State also presented Officer Leibold's in-car camera video of Manning's statements after his arrest and photographs of S.M.'s injuries without objection.

S.M. testified that he didn't remember anything after the second blow. He believed he may have blacked out. He did recall that it took him a couple of minutes to get up after being kicked in the head. S.M. insisted that he never touched or threatened Manning but that Manning threatened to kill him before throwing the final punch. S.M. lost four teeth and suffered fractures to his nose and eye during the attack. He still had blurry vision and missing teeth six months later.

Manning testified in his own defense. He recalled that S.M. had been drinking that night, and he "got upset basically saying I was disrespecting his fiancée." According to Manning, after they stopped at QuikTrip, S.M. "continued to threaten" him and tried to remove him from the vehicle. Manning testified that S.M. repeatedly said that "he was going to beat my ass." And Manning said that "when [M.B.M.] was reversing the vehicle, [S.M.] got out while it was moving and tried to forcibly remove me once again and I felt in fear and danger." Manning

acknowledged that he pushed S.M. down after he got out of the car, and that he punched and kicked him while he was on the ground. But he claimed that he was defending himself because he "was expecting for [S.M.] to attack" him; "I didn't know how far he would go and I just wanted him to stop." Manning was not injured.

The jury found Manning guilty as charged. The district court sentenced him to a term of up to ten years in prison. Manning appeals.

## II. Scope and Standards of Review

We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Cook*, 996 N.W.2d 703, 708 (Iowa 2023). We are bound by the verdict if it is supported by substantial evidence. *State v. Slaughter*, 3 N.W.3d 540, 546 (Iowa 2024). Evidence is substantial if it "would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022) (citation omitted). "We consider all evidence, not just the evidence supporting the conviction, and view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Ernst*, 954 N.W.2d 50, 54 (Iowa 2021) (citation omitted).

We review most evidentiary rulings for abuse of discretion. *Slaughter*, 3 N.W.3d at 546. "An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (citation omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* at 547 (citation omitted).

## III. Analysis

### A. Sufficiency of the Evidence

The district court instructed the jury that, to convict Manning of willful injury causing serious injury, the State had to prove:

> 1. On or about December 26, 2022, [Manning] punched and/or kicked [S.M.].
> 2. [Manning] specifically intended to cause a serious injury[3] to [S.M.].
> 3. The acts of [Manning] caused a serious injury to [S.M.].
> 4. [Manning] was acting without justification.

Manning only challenges the State's proof of the second element. He argues that the State failed to present substantial evidence that he specifically intended to cause a serious injury, rather than just a bodily injury. He emphasizes the lack of evidence "that there was a previous altercation or history of bad blood" between him and S.M. and the fact that he did not use a weapon during the assault. And he contends that "the evidence shows this was a fight that broke out quickly" and that S.M. "was the instigator of the altercation." Thus, he urges us to remand for entry of an amended judgment of conviction and resentencing on the lesser-included offense of assault causing serious injury. *See* Iowa Code § 708.2(4) (2022); *State v. Brown*, 996 N.W.2d 691, 700 (Iowa 2023) ("Based on the language of the statute, assault is a necessary component of willful injury.").

---

[3] The court instructed the jury that "'[s]pecific intent' means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind," and defined "serious injury" as "a bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or extended loss or impairment of the function of any bodily part or organ." Manning does not challenge the district court's jury instructions, which are law of the case for purposes of our review. *See, e.g.*, *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022).

On our review, we find substantial evidence supporting the specific intent element. "Specific intent is seldom capable of direct proof." *State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998). So we examine "all the circumstances attending the assault, together with all relevant facts and circumstances disclosed by the evidence." *State v. Bell*, 223 N.W.2d 181, 184 (Iowa 1974). And we may consider the extent of the victim's injuries in determining the defendant's intent. *Id.*

S.M.'s testimony, along with the body camera recording of the QuikTrip surveillance video—which was published twice during the State's case-in-chief and again during Manning's testimony—demonstrated the brutal nature of the attack.[4] The jury also saw photographs documenting the extent of S.M.'s injuries, which Manning does not deny were serious. What's more, Manning admitted that he punched and kicked S.M. while he was on the ground. The jury was free to accept S.M.'s version of events and to reject Manning's claim that he was acting in self-defense. *See State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019) ("The jury is entitled to reject a party's evidence and credit the evidence against it."). From these facts, the jury could reasonably infer that Manning specifically intended to cause a serious injury to S.M. We therefore decline to reverse Manning's conviction on this ground.

**B. Surveillance Video**

We now turn to Manning's challenge to the admission of the police body camera recording of the QuikTrip surveillance video. Manning argues that the

---

[4] For sufficiency purposes, we consider all evidence presented at trial, even if the defendant contends it was wrongly admitted. *State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

district court erred in admitting that exhibit over both his authentication and best-evidence objections. We start with his authentication claim. Authentication is a threshold requirement for admissibility. *State v. Burgdorf*, 861 N.W.2d 273, 276 (Iowa Ct. App. 2014). To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Iowa R. Evid. 5.901. In other words, the proponent must lay a proper foundation for the evidence to be admitted. As for video evidence, our supreme court has held:

> [A] proper foundation for the admission into evidence of a motion picture film demands only that the fidelity of the film's portrayal be established. When . . . a witness to the event purportedly depicted by the film testifies that the film accurately portrays that event, a foundation has been established upon which the trial court, in the exercise of its sound discretion, may admit the film into evidence.

*State v. Deering*, 291 N.W.2d 38, 40 (Iowa 1980).

The facts here present an atypical authentication problem. As Manning's trial counsel explained his objection:

> This is a video within a video. I concede that an officer can lay the foundation for his [body camera] video. Here's the problem with this particular case: The [surveillance] video that [Officer Bruckner] is observing, he cannot lay the foundation for that, so I am deprived of the ability to cross-examine that video itself.
> That is a particular problem because we can see that that video is being manipulated, not in a nefarious sense but going back and forth between different screens, zooming in, the manner in which that was done, he didn't do that so he can't describe how precisely that's happening with that video. He cannot lay the foundation for the video within a video.

The district court overruled Manning's objection, finding that the State could authenticate and present the video exhibit to the jury through Officer Bruckner's testimony. The court explained its reasoning:

[A]t the outset the court will note that the authentication or foundational requirements for evidence, the bar for that is a relatively low one. It's less than [a] preponderance of the evidence. What's required is some indicia that what is being admitted is a true and accurate depiction of what is being shown to the jury.

The court has reviewed several different cases from other jurisdictions where there were objections to a video recording where there was no specific foundational witness. . . . [T]hose cases rely on a doctrine that is, I think, known as the silent witness doctrine which basically says that a video can speak for itself in most cases. However, in all of those cases that the court reviewed, there has to be some type of foundational evidence that the video is what the video purports to be. . . .

In this case the court does understand that what we have is a more complicated situation in which we have an officer whose body cam was running, who took video of a surveillance video from a convenience store in this case.

The court continued:

The court does not believe that any of the objections made by the defendant would prohibit Officer Bruckner from testifying to the foundation for admission of his body cam video or for his testimony as to what he saw on a security video and describing that to the jury as well as what he did then after reviewing the video.

The court also believes . . . that should the victim testify in this case that he could after watching the video authenticate it by indicating it was a fair and accurate depiction of what occurred at the time of the assault. . . .

However, the court does believe that the State can introduce the body cam footage through Officer Bruckner. . . . Absent some argument that Officer Bruckner somehow modified or altered the video inside the body cam video and that it's not accurate, the body cam video itself is admissible.

Manning now argues that the State failed to properly authenticate the QuikTrip surveillance footage, as recorded on Officer Bruckner's body camera. He first contends that the court improperly admitted the video under the "silent witness" doctrine. Under that theory, the proponent can authenticate a video recording by presenting "evidence describing the process or system that produced the video[] and showing that the video is an accurate representation of the events

in question." *Toney v. State*, 206 N.E.3d 1153, 1155 (Ind. Ct. App. 2023); *see also State v. Holderness*, 293 N.W.2d 226, 230 (Iowa 1980) (stating a witness "who describes the photographic process employed and testifies it produces accurate pictures" can authenticate photographic evidence); Iowa R. Evid. 5.901(b)(9). Manning asserts that the State did not properly authenticate the surveillance video under this theory because Officer Bruckner testified that he was not controlling the surveillance cameras; he was unfamiliar with the camera system and how it recorded; and he couldn't testify to the accuracy or reliability of the surveillance footage. Nor could Officer Bruckner testify that the surveillance video accurately portrayed what occurred during the altercation in the parking lot because he responded after the fact. *See Deering*, 291 N.W.2d at 40.

Manning next points out that the State suggested it could use S.M. as the foundational witness but did not do so. Instead it offered the exhibit through Officer Bruckner's testimony. And he contends that S.M. could not authenticate the exhibit because he did not testify that the surveillance video accurately portrayed the incident. *See id.* Indeed, the State republished the exhibit—which was already admitted—during S.M.'s testimony. Although he testified that he had seen the video before, S.M. initially denied that the vehicle shown in the video was the one he was riding in and denied that he was the person in the video who fell to the ground. He later agreed with the prosecutor that he was shown in the video. But when the prosecutor asked S.M. if "[t]he assault that we watched on this video [was] roughly how you remember this happening," he answered: "After the second hit I didn't remember the other hit until I [saw it] on the video because I was out."

The State counters that the video exhibit was properly authenticated through the testimony of Officer Bruckner, S.M., and Manning himself. The State points to Officer Bruckner's testimony that the exhibit was his body camera video, and that it accurately recorded the QuikTrip surveillance footage he watched at the scene just after the assault occurred. Officer Bruckner also confirmed that the surveillance video "match[ed] the representations" of what S.M. and M.B.M. told him had happened. The State also asserts that while S.M. "initially disputed that the video showed the beating because [he] thought he was in a black Camry, not a silver SUV, he later realized that the video showed the assault." And the State points out that Manning "saw the video on the stand and agreed that it showed him kicking and punching the victim" and Manning "did not dispute the video's accuracy" during his testimony. Lastly, the State contends that it was not relying on the "silent witness" theory "because three witnesses with knowledge testified that the surveillance video accurately recorded what happened."

We agree that police officers' testimony can usually authenticate their body camera videos. But that misses the point here. The State presented Officer Bruckner's body camera recording of the QuikTrip surveillance video as a substitute for the surveillance video itself.[5] Officer Bruckner did not witness the fight between Manning and S.M. in the QuikTrip parking lot nor could he testify to the accuracy of the surveillance camera footage. Had the State offered the original surveillance video, Officer Bruckner could not have properly authenticated it. *See*

---

[5] The State explained to the district court that it did not have the original surveillance video because "QuikTrip sent the wrong time stamps to the detective and the time for which to review that video was delayed due to the defendant being in warrant status."

*Burgdorf*, 861 N.W.2d at 277–78 (finding district court improperly admitted surveillance video from Wal-Mart "without foundational testimony from a Wal-Mart representative"). Under these facts, we find that Officer Bruckner could not authenticate the video within the video, as defense counsel described it.

We also reject the State's argument that the video exhibit was authenticated through the testimony of S.M. or Manning. The court admitted the exhibit before either of them testified. Even if their testimony was consistent with what the video showed, they could not retroactively authenticate the already-admitted exhibit. *See id.* at 276 ("Iowa Rule of Evidence 5.901 requires authentication . . . as a condition precedent to admissibility."). The State could have authenticated and introduced the exhibit through the testimony of a witness who personally observed the altercation between Manning and S.M. or a witness with knowledge of QuikTrip's surveillance camera system. *See Deering*, 291 N.W.2d at 40; *Holderness*, 293 N.W.2d at 230. But it did not.[6] Accordingly, we find that the district court abused its discretion by admitting the exhibit without proper authentication.

We next address Manning's claim that the district court should have excluded the video exhibit under the best-evidence rule.[7] That rule provides that "[w]hen a party is attempting to prove the contents of a writing, recording, or photograph, the courts require the original to be produced." *State v. Khalsa*, 542 N.W.2d 263, 268 (Iowa Ct. App. 1995) (citing Iowa Rs. Evid. 5.1001–.1008). A

---

[6] The State did not call M.B.M., the QuikTrip store clerk, or any other QuikTrip representative to testify.

[7] We do so because "[t]he issue has been fully briefed by both parties and is likely to come up again on retrial." *See State v. Skahill*, 966 N.W.2d 1, 17 (Iowa 2021).

duplicate—meaning "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original"—"is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Iowa Rs. Evid. 5.1001(e), 5.1003. "The purpose of the best evidence rule is to secure the most reliable information as to the contents of [the evidence], when those terms are disputed." *Khalsa*, 542 N.W.2d at 268. "The rule goes only to the competency of the evidence, not to its relevancy, materiality, or weight." *Id.*

At trial, Manning's counsel argued that Officer Bruckner's body camera recording was "an inadequate and incomplete copy" of the QuikTrip surveillance video.[8] The district court overruled Manning's best-evidence objection, finding that the body camera recording was "a video of the output from the security camera so . . . under the rule . . . that satisfies the original requirement." The court also ruled that Manning's "objection that any editing or manipulation of that video by somebody who is not here to testify or to explain what happened would go to the weight of that evidence and not to its direct admissibility."

On appeal, Manning concedes that the fact "the State produced a copy is not in itself problematic." But he asserts that the district court erred in admitting the body camera recording as a duplicate of the surveillance video because "it was not clear what had occurred during the surveillance footage, as captured on the body camera video"; because Manning's trial "counsel questioned if the video had

---

[8] Manning's trial counsel paired his best-evidence objection with an objection based on the rule of completeness. *See* Iowa R. Evid. 5.106.

been edited"; and because "it was also not apparent if the video was in real time or the frame rate." He also contends that "the circumstances made it unfair to admit the duplicate" because his trial counsel "was unable to utilize tools to find out . . . if the video had been edited or manipulated because it never received a copy of the actual QT surveillance video," and his counsel could not "view any other angles or views that were not captured on Bruckner's body camera."

The State responds that the best-evidence rule does not apply because Manning did not seriously dispute the content of the surveillance video at trial, and the district court ruled that his objection went to the weight of the evidence, not its admissibility.[9] *See State v. Evans*, No. 19-2083, 2020 WL 7385280, at *3–4 (Iowa Ct. App. Dec. 16, 2020) (citing *Khalsa*, 542 N.W.2d at 268) ("[T]he best evidence rule does not bar admission of evidence when the objecting party fails to dispute the 'reliability or competency' of the evidence itself."). We agree with the State's argument on the best-evidence rule. Manning did not deny that the QuikTrip surveillance video depicted the scene in the parking lot. And the district court was correct that Manning's concerns about editing or manipulating the video went to its weight rather than its admissibility. *See id.* So the best-evidence rule is not an alternative ground for exclusion of the video exhibit on this record. Whether the same can be said on retrial will depend on the record made then.

Finally, we must decide whether Manning was prejudiced by the erroneous admission of the exhibit over his authentication objection. When the district court abuses its discretion in admitting prosecution evidence, we presume harm to the

---

[9] Alternatively, the State argues that the body camera recording was an acceptable duplicate.

defense; "the State bears the burden of showing lack of prejudice." *State v. Huston*, 825 N.W.2d 531, 539 (Iowa 2013).

Manning contends that he was prejudiced because "the State relied heavily on the video in presenting its evidence and proving its case." The State, on the other hand, argues that any error was harmless because the video duplicated testimony from S.M. and Manning, and the evidence of Manning's guilt was overwhelming. After our careful review, we cannot conclude that the State carried its burden to prove that Manning suffered no prejudice from the erroneous admission of the exhibit. The State published the surveillance video six times during trial—twice during its case-in-chief, again during Manning's testimony, and another three times during its closing arguments. The State used the exhibit to bolster S.M.'s account of the assault and argued in closing that the video was proof of Manning's specific intent and lack of justification. This record does not show that the exhibit "did not impact on the jury's finding of guilt." *State v. Nims*, 357 N.W.2d 608, 609 (Iowa 1984). We therefore reverse Manning's conviction and remand for a new trial.

**REVERSED AND REMANDED.**