# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-1563
Filed January 28, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,

v.

**Max Amyda,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Woodbury County,
The Honorable Steven J. Andreasen, Judge.

———————————

**AFFIRMED**

———————————

Martha J. Lucey, State Appellate Defender, and Mary K. Conroy (argued),
Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Joshua Henry (argued),
Assistant Attorney General, attorneys for appellee.

———————————

Heard at oral argument
by Tabor, C.J., and Ahlers and Langholz, JJ.
Opinion by Langholz, J.

**LANGHOLZ, Judge.**

Max Amyda appeals his conviction for third-degree sexual abuse, challenging the admission of a digital video that was sent to the victim online and purportedly shows him sexually abusing the victim while she was asleep. He argues that the State failed to authenticate the video under Iowa Rule of Evidence 5.901 because it did not present testimony of a witness who personally observed the conduct depicted in the video or who could describe the process or system that made the video. And he argues that the video's admission violated the best-evidence rule because it was not an original under rule 5.1001 and a duplicate should not have been admitted under rule 5.1003 because he raised a genuine question about the original's authenticity—alleging that the video was a "deepfake."

The district court did not abuse its discretion in admitting the video. The path to authentication of a video is not so narrow as Amyda contends. Circumstantial evidence based on the "distinctive characteristics" and other contents of the video and all the surrounding circumstances can also be sufficient to support a finding that the video is what it claims to be—a depiction of the victim being sexually abused by Amyda in early May 2023. Iowa R. Evid. 5.901(b)(4). So the court was within its discretion to conclude that the State made such a showing with the victim's detailed testimony that she recognized her body, her partial clothing, the room, and Amyda's hand— all consistent with the only time that he was in her room in early May 2023.

So too was the court within its discretion to reject Amyda's best-evidence challenge. Assuming the rule applies to this video and that the video is not an original, it was still admissible as a duplicate because Amyda's speculative claims that the video was a "deepfake" without any evidentiary support did not raise a genuine question about the video's authenticity.

## I. Background Facts and Proceedings

On May 5, 2023, a woman—the victim in this case—reached out to her life-long friend to make plans to hang out. But the friend was busy and suggested that the victim ask the friend's uncle—Amyda—to hang out instead. The victim had never spent time alone with Amyda before. But he had been to her sister's house—where the victim lived with her sister and her sister's husband and young kids—once before with another friend. The victim took the suggestion and reached out to Amyda through Facebook Messenger to invite him over. And that night, Amyda visited the house.

First, the victim and Amyda listened to music and drank alcohol together in the garage. Late into the night, she became tired and they went to her bedroom. They were both drunk and began kissing. Then Amyda took off his clothes and repeatedly asked the victim to have sex with him. But she rejected Amyda and never took her clothes off. She eventually fell asleep. When she woke, Amyda was sleeping next to her, and they were both fully clothed. Amyda left later that evening.

A few weeks later in mid-June, the victim received a message through Facebook Messenger from her sister. The message included a roughly one-minute-long video that her sister had received from another family member. The video started by showing a woman's vaginal and surrounding pubic area. It then panned up to show the victim's torso and face. She was lying down on her bed asleep or unconscious—her eyes were closed and steady breathing could be heard in the video's audio. And she was wearing only what appears to be a sports bra. Then, a person's hand started manipulating her vagina and spread apart her labia while the video zoomed in close to the vagina and at other times again panned up to show the rest of the victim's body and face. After nearly a minute of this, in the final ten seconds, the video focused on

the victim's pubic hair and showed the hand pointing at the hair and giving a thumbs-down gesture. The hand then scratched the hair, as if shaving it, and concluded with a thumbs-up gesture. For parts of the video, the back of the left hand could be seen with a tattoo on it. The tattoo appeared to be in the shape of an "X" with one of the lines replaced by an arrow pointing toward the wrist and a few other small numbers or letters under the "X."

The victim was devastated. She recognized herself, her clothes, and her room. She recognized Amyda's hand and his tattoo. And she was shocked to learn that he had touched her that way without her permission.

The victim immediately reached out to Amyda through Facebook Messenger again "to find out why he did this kind of thing to me." But rather than responding, Amyda blocked her so she could not communicate with him further.

The next day, the victim and her sister went to the police and gave them the video. A detective investigating the sexual abuse phoned Amyda at least twice, telling him that a complaint of sexual abuse had been made and trying to schedule an in-person meeting. But Amyda did not cooperate. And the State eventually charged Amyda with third-degree sexual abuse.

Before trial, Amyda moved in limine to exclude the video or any testimony about the video. He argued that the State could not authenticate the video because none of the witnesses listed in the minutes of testimony "observed the video being shot" and so there was no evidence of "who shot it, where it was shot, when it was shot and whether the video is an accurate, unaltered representation of the events depicted in it." He also argued that "The Best Evidence Rule Precludes the Admissibility of the Video." But while Amyda quoted the rules of evidence and cases applying the best-

4

evidence rule, he did not make any specific argument as to how admission of the video violated that rule.[1]

The district court held an evidentiary hearing to resolve the authentication objection as a preliminary question, "so that the parties will know at least whether that foundation is established for" the video before trial. *See* Iowa R. Evid. 5.104. The State presented testimony from the victim, her sister, and the detective to whom they turned over the video.

Four days later, the district court denied Amyda's motion in a thorough written ruling. While the court agreed with Amyda that no witnesses could authenticate the video by testifying that they observed the conduct shown on the video or the process by which it was shot, the court still concluded that Amyda's authentication objection failed because there was sufficient circumstantial evidence "establishing that the video depicts a sex act being performed on [the victim]" and that it "depicts [Amyda] performing such sex act on or about May 5, 2023." The court reasoned that this evidence included the victim's detailed testimony that: (1) "the video shows her face, her body, and specifically her vaginal area," including "stretch marks and other distinctive features of her body"; (2) "the bed and other items on the video accurately depicted her bedroom"; (3) "the appearance of her, her bed, her bedroom, and the like depicted in the video appear to be in the same condition as existing on May 5, 2023"; (4) "she observed a tattoo on [Amyda's] hand when they were together May 5, 2023, that looked similar to the tattoo observed on the hand in the video"; and (5) Amyda "was lying next to her on the bed when she fell asleep and was there when she woke up the following morning, indicating that [Amyda] not

---

[1] Amyda also raised other evidentiary and constitutional objections to the video and testimony about the video that he no longer pursues on appeal.

only had the opportunity to do what is depicted in the video but was also arguably the only person with that opportunity."

The court also rejected Amyda's best-evidence objection, concluding that the video received by the victim through Facebook Messenger "is arguably the 'original'" because "[i]t is what they received and viewed." Alternatively, the court reasoned that even "[i]f the video captured by the phone, camera, or device at the time it was being taken is the original, the Court concludes that such original is either lost or destroyed not due to bad faith of the State or otherwise cannot be obtained by any available judicial process."

During the August 2024 jury trial, the district court admitted the video over Amyda's renewed objections. The court also admitted a photograph taken from the video that showed the tattoo on the back of the left hand as it was touching the victim's vagina. And the jury heard testimony from the victim, her sister, and the detective to whom they turned over the video—all generally consistent with their testimony at the motion-in-limine hearing.

After the State rested, Amyda presented photos of his hands taken a few weeks before trial and a stipulation authenticating the photographs. These photos showed a different tattoo on his left hand than the left hand in the video. Rather than the simple "X" with an arrow pointing toward the thumb joint, the tattoo was an elaborate skull wearing a hood.

In rebuttal, the State submitted booking photos of Amyda's hands that were taken when he was arrested at the end of July 2023—a little more than a month after the victim received the video, reached out to Amyda for an explanation, and reported the video to the police in mid-June. The photo of Amyda's left hand also showed the skull tattoo on Amyda's left hand. But the

6

State called an experienced tattoo artist who provided his expert opinion that the skull tattoo was "new" and had been placed on Amyda's hand in the two weeks before the photo was taken. The tattoo expert explained that the July 2023 photo showed "peeling and flaking skin around the more intense dark areas," which was "a dead giveaway" that it was still in the first two weeks of healing. The expert also explained that when a good tattoo artist puts a tattoo over an earlier tattoo, the earlier tattoo is not visible anymore—and that he could not tell from the photo whether the new skull tattoo had been put over another tattoo.

The jury found Amyda guilty of third-degree sexual abuse. And the district court sentenced him to a ten-year indeterminate prison sentence. Amyda now appeals his conviction, challenging only the district court's decision to admit the digital video.

## II.    Authentication of the Digital Video

Amyda first argues that the district court should have excluded the digital video because the State failed to authenticate it with a proper foundation. We review this evidentiary ruling for an abuse of discretion. *See State v. Manning*, 26 N.W.3d 385, 390 (Iowa 2025). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable or if it bases its conclusions on an erroneous application of the law." *State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022) (cleaned up).

To authenticate the video, like any item of evidence, the State had to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Iowa R. Evid. 5.901(a). The State was not required to explain "all the circumstances surrounding" the video. *Manning*, 26 N.W.3d at 392 (cleaned up). Nor did it have to produce "[c]lear, certain and positive

7

proof." *Id.* (cleaned up). Rather, circumstantial evidence can be enough. *Id.* And ultimately, the State was merely required to "provide sufficient information that *could* allow a jury to determine the evidence is what the proponent claims." *Id.* at 393 (cleaned up).

Among rule 5.901's non-exhaustive list of examples "of evidence that satisfies the" authentication requirement, is: "*Distinctive characteristics and the like.* The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Iowa R. Evid. 5.901(b)(4). Although this method of authentication may be used in combination with other examples in the rule, authentication of a photo or video with rule 5.901(b)(4) evidence does not rest on a witness who personally witnessed the depicted activities or created the photo or video. *See State v. Farnum*, 397 N.W.2d 744, 746 (Iowa 1986) (relying in part on rule 5.901(b)(4) to hold that five photos were properly authenticated by a detective's testimony that "the decor of the room" shown in the photos matched his personal observations of the defendant's bedroom even though the detective was not "a direct witness to the depicted activities" but also relying on rule 5.901(b)(3) because the photos were "graphically similar" to other photos that had already been authenticated by direct witnesses who were depicted in the photos); *see also State v. Deering*, 291 N.W.2d 38, 39 (Iowa 1980) ("[T]he basic principles which govern the admission of photographs also apply to the admission of motion picture films taken without artificial reconstruction.").

Our supreme court discussed this type of authentication evidence most extensively in *State v. Holderness*, 293 N.W.2d 226 (Iowa 1980). There, the State sought to admit a photo—taken on a roll of film from a camera that was stolen in a burglary—which the State claimed was "a picture of the

burglar," apparently accidentally taken by the burglar himself while crouching outside the victim's garage. *Id.* at 228, 234. The photo was the only evidence identifying the burglar. *Id.* at 230. And the State had no witness who observed what the photo depicted or could describe how the photo was taken—although the victim who owned the camera gave limited general testimony about the reliability of the camera "and the photographic process." *Id.* at 231.

But the victim could testify about the short time window between when his camera was stolen and a neighborhood boy returned to him "a roll of film of the kind which he had in the camera." *Id.* at 228, 234. He testified that he took the first eight pictures from that roll. *Id.* at 227. And he recognized his boat and trash can appearing in the background of the photo of the purported burglar. *Id.* at 228. The court acknowledged that "[c]onventionally," a photo is authenticated "by the direct testimony of a person who, although perhaps not connected with the photography, observed the scene and testifies that the picture fairly shows it, or who describes the photographic process employed and testifies it produces accurate pictures." *Id.* at 230. And it reasoned that "[t]he harder cases are those in which direct testimony is not available and the proponent must rely on circumstances to lay a foundation for admission." *Id.* Yet relying on nearly identical language to rule 5.901(b)(4) in the Federal Rules of Evidence and precedent from other jurisdictions,[2] the court held that the mostly circumstantial evidence from the testimony was "sufficient to support a finding that the photograph is what the State claims." *Id.* at 234 (cleaned up). And so, the court affirmed the district court's admission of the photo. *Id.*

---

[2] *Holderness* was decided a few years before the adoption of the Iowa Rules of Evidence, which were modeled after the federal rules.

Similarly here, the State claimed that the video depicts Amyda sexually abusing the victim in her bedroom on or about May 5, 2023. And much circumstantial evidence, including from distinctive characteristics shown in the video, would support a finding that the video is what the State claims.

To start, the victim testified that she invited Amyda to hangout with her and that he stayed the night with her on May 5, 2023, that they drank alcohol and became drunk, and that she fell asleep and woke up with Amyda beside her. These circumstances place Amyda in her room while she was asleep, giving him the opportunity to do the acts in the video. Indeed, given her testimony that this night was the only time she was ever alone with him, a jury could find that around May 5, 2023, was the only time that the acts could have occurred.

The victim also testified that she recognized many details of her bedroom in the video, including her bed, pillow, and clothing. She testified that the clothes she has on in the video are the same clothes she had on the night that Amyda stayed with her. She also recognized her own body and specific, extremely personal details—including her face, vagina and its internal coloring, her pubic hair, stretch marks, and hair stubble on her legs.

And the victim recognized the hand—and the distinctive tattoo on the hand—in the video as Amyda's. Her identification of Amyda as the sexual abuser in the video is further supported by her testimony that she communicated with Amyda through Facebook Messenger, that the video was circulated through Facebook Messenger, and that when she reached out to Amyda on Facebook Messenger asking for an explanation, he blocked her.

The victim's sister backed up the victim with her own testimony about the circumstances of Amyda's visit to her house. And she too recognized

10

distinctive details in the video, including the victim, her clothing, the bedroom and bed sheets.

Amyda offers no counterargument against the sufficiency of all this circumstantial evidence aside from his claim that the State had to present testimony of a witness who personally observed the conduct depicted in the video or one who could describe the process or system that made the video. But this narrow view of rule 5.901's authentication requirement is wrong. To be sure, those are permissible methods of authentication. *See* Iowa R. Evid. 5.901(b)(1), (9). But so is using circumstantial evidence from the distinctive contents of the video and surrounding circumstances. *See* Iowa R. Evid. 5.901(b)(4); *Holderness*, 293 N.W.2d at 230–34.

What's more, other states with similar authentication rules have also approved of authenticating videos mainly through circumstantial evidence. *See, e.g.*, *State v. Anglemyer*, 691 N.W.2d 153, 159–63 (Neb. 2005) (affirming authentication of videotape showing defendant's sexual conduct with a dog in a motel room based on testimony about distinctive features of the room, a date stamp on the video, motel guest records, and identification of the dog); *State v. Sapp*, 332 P.3d 1058, 1062 (Wash. Ct. App. 2014) (affirming authentication of digital videos showing sexual abuse of a child who did not testify based on testimony of the victim's grandmother—who did not observe the abuse—identifying the victim, the victim's age in the video, the location shown in the video, and the defendant); *State v. King*, 626 S.W.3d 828, 841–42 (Mo. Ct. App. 2021) (affirming authentication of video showing sexual assaults of unconscious victim); *State v. A.S.*, No. A-5420-13T1, 2015 WL 6442387, at *4 (N.J. Super. Ct. App. Div. Oct. 26, 2015) (affirming authentication of video showing sexual assault of sleeping victim). And this remains so even though videos are "susceptible to alteration, and the

increased availability of new technology, particularly the advent of image-generating artificial intelligence, may present unique challenges in authenticating videos and photographs." *Mooney v. State*, 321 A.3d 91, 110–11 (Md. 2024) (reaffirming authentication of digital video by circumstantial evidence and noting that "photographic manipulation, alterations and fabrications are nothing new, nor are such changes unique to digital imaging, although it might be easier in this digital age" (cleaned up)).

Bottom line, the State's circumstantial evidence of authentication was sufficient for a jury to find that the video is what the State claims—a depiction of Amyda sexually abusing the victim in her bedroom around May 5, 2023. So the court did not abuse its discretion in admitting the video over Amyda's authentication objection.

## III.   Best Evidence of the Digital Video

Amyda next argues that the district court should have excluded the digital video under the best-evidence rule because it was not an original and a duplicate was inadmissible since he raised a genuine question about the original video's authenticity. The State counters by questioning whether the best-evidence rule applies to videos like this one at all, contending that an identical copy of a video should be treated as an original rather than a duplicate, and arguing that it is admissible as a duplicate because Amyda raised no genuine issue about the video's authenticity. Again, we review for abuse of discretion. *See Manning*, 26 N.W.3d at 393.

Iowa's best evidence rule—codified in Iowa Rules of Evidence 5.1001 through 5.1004—provides that "[a]n original writing, recording, or photograph is required to prove its content, unless these rules or a statute provides otherwise." Iowa R. Evid. 5.1002. And the rules otherwise provide that "[a] duplicate is admissible to the same extent as the original unless a

genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Iowa R. Evid. 5.1003; *see also* Iowa R. Evid. 5.1001(e) (defining a "duplicate" as "a counterpart produced by a[n] . . . electronic, or other equivalent process or technique that accurately reproduces the original").

We need not resolve all the interesting issues raised by the parties. Assuming without deciding that the best-evidence rule applies to this video and that the video received by the victim is not an original, it is a duplicate "admissible to the same extent as an original." Iowa R. Evid. 5.1003. True, Amyda argued at the motion-in-limine hearing and throughout trial that the video may have been a "deepfake"—created through generative artificial intelligence when the underlying conduct never actually occurred. But Amyda pointed to no evidence in the record supporting this speculative theory. And nothing about the video gives even the slightest hint that it is an artificial creation. Bare conjecture is not enough to raise "a genuine question . . . about the original's authenticity" or to make it "unfair to admit the duplicate." *Id.*; *see also Manning*, 26 N.W.3d at 393 (rejecting best-evidence challenge where defendant "did not seriously dispute the content of the video," despite an authentication challenge, and agreeing with the district court that "any editing or manipulation of that video would go to the weight of that evidence and not to its direct admissibility" (cleaned up)).

The district court did not abuse its discretion in admitting the digital video over Amyda's best-evidence objection. We thus affirm Amyda's conviction.

**AFFIRMED.**